1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10    CHANCELLOR WADE,

11                    Petitioner,                No. CIV S-08-0456 MCE GGH P

12          vs.

13    M.C. KRAMER, et al.,

14                    Respondents.               FINDINGS AND RECOMMENDATIONS

15    _____/

16    *Introduction and Summary*

17                    Petitioner Wade was charged with the robberies of three banks in Sacramento

18    during a one-week period in November 2003.  His defense was mistaken identity.  Defendant,

19    representing himself, obtained an acquittal of one of the robberies, a deadlocked jury on the

20    second, and a guilty verdict on the lesser offense of grand theft as to the third.  He was then

21    retried on the second count.  The trial aspect of this habeas petition involves the retrial of the

22    second count.  The Batson [v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986)]  issue adjudicated

23    on appeal appears in People v. Wade, 2007 WL 701495, Cal. App. No. C049976 (2007), and

24    concerns the retrial on the second count.  For whatever reason, the issues pertinent to the grand

25    theft conviction were adjudicated separately by the Court of Appeal, People v. Wade, 2007 WL

26    701578, Cal. App. No,. C049324 (2007).  The grand theft conviction is pertinent only insofar as

                                                     1

1  petitioner was resentenced on that conviction after the second trial robbery conviction.

2          Petitioner filed his federal habeas petition on August 19, 2008.  Petitioner sought

3  permission to exhaust claims not raised previously, and ultimately he was given permission to do

4  so.  This case was then stayed and re-opened after exhaustion on February 6, 2009.  In short, the

5  net result of all this adjudication is that respondent concedes that all issues raised herein are

6  exhausted.  Those issues are:

7  1. The trial court in the retrial erroneously denied a Batson challenge;

8  2. Failure to grant petitioner's request for a lesser included offense instruction (and Ineffective

9  Assistance of Appellate Counsel for not raising this issue on appeal);

10 3. Apprendi/Cunningham issues with respect to imposition of the upper term (and Ineffective

11 Assistance of Appellate Counsel for not raising these issues on appeal).

12         The undersigned recommends that the writ be granted on the Batson challenge,

13 but that the petition be denied as to the remaining claims.

14 *AEDPA Standards*

15          The AEDPA "worked substantial changes to the law of habeas corpus,"

16 establishing more deferential standards of review to be used by a federal habeas court in

17 assessing a state court's adjudication of a criminal defendant's claims of constitutional error.

18 Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

19         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

20 Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

21 for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

22 between "contrary to" clearly established law as enunciated by the Supreme Court, and an

23 "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies

24 to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

25 Court on a point of law, or (2) if the state court case is materially indistinguishable from a

26 Supreme Court case, i.e., on point factually, yet the legal result is opposite.

1    "Unreasonable application" of established law, on the other hand, applies to

2    mixed questions of law and fact, that is, the application of law to fact where there are no factually

3    on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

4    Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

5    AEDPA standard of review which directs deference to be paid to state court decisions.  While the

6    deference is not blindly automatic, "the most important point is that an *unreasonable* application

7    of federal law is different from an incorrect application of law....[A] federal habeas court may not

8    issue the writ simply because that court concludes in its independent judgment that the relevant

9    state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

10   that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

11   1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

12   objectively unreasonable nature of the state court decision in light of controlling Supreme Court

13   authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

14   The state courts need not have cited to federal authority, or even have indicated

15   awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

16   Ct. 362  (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

17   contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

18   unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

19   occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76 , 123 S. Ct. 1166, 1175 (2003).  Moreover,

20   the established Supreme Court authority reviewed must be a pronouncement on constitutional

21   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

22   binding only on federal courts.  Early v. Packer, 537 U.S. at 10, 123 S. Ct. at 366.

23   However, where the state courts have not addressed the constitutional issue in

24   dispute in any reasoned opinion, the federal court will independently review the record in

25   adjudication of that issue.  "Independent review of the record is not de novo review of the

26   constitutional issue, but rather, the only method by which we can determine whether a silent state

3

1  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

2  2003).

3         At step 3 of a Batson inquiry, the federal court in habeas applies 28 U.S.C.

4  2254(d)(2), i.e., did the state court make a "decision that was based on an unreasonable

5  determination of the facts." See Collins v. Rice, 546 U.S. 333, 126 S.Ct. 969 (2006).

6  *Discussion*

7         A.  The Batson Issue

8         The Court of Appeal undertook a lengthy analysis of this issue, but perhaps in a

9  flawed fashion.  After correctly setting forth the tripartite paradigm for analyzing claims of

10  discriminatory challenges, and citing Johnson v. California, 545 U.S. 162, 125 S.Ct. 2410 (2005),

11  the appellate court found the trial court correct in its finding of no prima facie case.  Instead of

12  just assessing the record to determine whether an inference of discrimination had been made

13  based on the challenges, the appellate court reviewed the possible reasons for striking the jurors

14  at issue to arrive at the determination that no inference was raised, i.e., it refuted the inference.

15  Moreover, the appellate court continued, and at one point after assuming the existence of a prima

16  facie case, the Court of Appeal effectively stopped at the second stage of its alternative analysis.

17  The question remains, however, whether petitioner proved that the prosecutor's stated reasons

18  were but a pretext for discriminatory peremptory challenges.

19         1.  *Background*

20         The prosecutor in this case excused three out of four African-Americans who had

21  been seated in the jury box for questioning.  One African-American juror remained as a seated

22  juror after challenges had been completed.  Petitioner made his first Batson/Wheeler [22 Cal. 3d

23  258 (1978)] challenge after the main jurors had been chosen, but before the alternates had been

24  seated.

25         The trial court first found that the Batson motion was not timely made under

26  California law.  RT 47.  Then the judge, after listening to petitioner stated to the prosecutor:

4

"Without shifting the burden of proof, do the People have justification for their peremptories?" RT 46.  The prosecutor queried: "[I]s the court finding that Mr. Wade has made– [a prima facie case]?"  RT 47.  The judge responded: "No. Just what I said, without shifting the burden of proof, or stating that he has made a prima facie showing, I'm just asking for your explanation."  Id.  The prosecutor made explanations for the three African-American jurors which were struck (which will be discussed in detail below), and aside from finding that the motion was untimely, simply ruled, without explanation, that no prima facie case had been made.  RT 52.

The appellate court, after citing Johnson v. California, supra, and after an extensive discussion of the jurors at issue found:

> Under the totality of the relevant facts, the record supports the trial court's determination that an inference of discriminatory purpose cannot be established.

People v. Wade, at *5.

The appellate court implicitly dismissed the trial court's finding that petitioner's motion was untimely.  This appellate court found that a motion made prior to the seating of the alternates was timely.  People v. Wade at *4.  The undersigned states that the dismissal was "implicit" because without expressly making any final timeliness determination, the Court of Appeal went on to analyze the merits of the Batson claim.  Therefore, the undersigned will not analyze any issue of procedural bar.  Respondent does not raise the issue either.

Johnson is an especially important case to analyze as it discussed the parameters of a prima facie case:

> "[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial. To establish such a case, the defendant first must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id., at 96, 106

5

1  S.Ct. 1712 (quoting Avery v. Georgia, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed.
   1244 (1953); citations omitted).
2  Johnson, 545 U.S. at 169, 125 S.Ct. at 2416-17 (quoting Batson)
                                    ***
3  We did not intend the first step to be so onerous that a defendant would have to
   persuade the judge-on the basis of all the facts, some of which are impossible for
4  the defendant to know with certainty-that the challenge was more likely than not
   the product of purposeful discrimination. Instead, a defendant satisfies the
5  requirements of Batson' s first step by producing evidence sufficient to permit the
   trial judge to draw an inference that discrimination has occurred.
6  Johnson, 545 U.S. at 170, 125 S.Ct. at 2417.
                                    ***
7  The first two Batson steps govern the production of evidence that allows the trial
   court to determine the persuasiveness of the defendant's constitutional claim. "It is
8  not until the third step that the persuasiveness of the justification becomes
   relevant-the step in which the trial court determines whether the opponent of the
9  strike has carried his burden of proving purposeful discrimination." Purkett, 514
   U.S., at 768, 115 S.Ct. 1769.
10

11  See also Wade v. Terhune, 202 F.3d 1190, 1197 (9th Cir. 2000) (prima facie case is "not taken

12  granted," but also, it is "not onerous.")  Also, it is well established that one cannot use a single

13  challenge based on race.  Gonzalez v. Brown, 585 F.3d 1202, 1206 (9th Cir. 2009).

14          The problem from a legal standpoint is understanding the strength of the inference

15  which must exist before it can be said that the inference exists for Batson purposes.  Does the

16  inference consist of simply striking an African-American juror for which reasonable minds could

17  differ on the suitability of the juror?  Is the inference to be drawn if there could be any dispute

18  whatsoever?   And more to the point – what constitutes an AEDPA unreasonable determination

19  that an inference has not been established?

20          Perhaps the case which comes closest to answering the above questions is

21  Williams v. Runnels, 432 F.3d 1102 (9th Cir. 2006).  In Williams, the court first held that it

22  would "normally" give AEDPA deference to a decision that the state courts found no prima facie

23  case.  Id. at 1105.[1]  There is no need to determine whether AEDPA deference would be denied to

24  a trial court, which, as in this case, blended the entire Batson analysis into a determination of no

25  ────────────────
26          [1]  Williams found in its case that because the state courts used the wrong standard for
    determining the first step in the Batson analysis, no AEDPA deference would be due at all.

6

1    prima facie case, because the Court of Appeal confirmed this finding without blending the

2    analysis.  Therefore, AEDPA deference would seemingly be due the decision that no prima facie

3    case occurred in petitioner's case.[2]  However, that initial blush decision will not hold up under

4    further scrutiny.

5            Williams went on to analyze the factors which it believed mandated the result that

6    a prima facie Batson violation had been demonstrated – first and foremost, that a statistical

7    disparity existed.  Williams discussed previous Ninth Circuit cases at p. 1106, which indicated a

8    statistical disparity.  In one case, challenging 5 of 6 African-American jurors was sufficient; in

9    another case challenging 4 of 7 Hispanics and 2 of 2 African-American jurors was sufficient; in a

10   third, challenging "only" 5 of 9 African-American jurors established the statistical disparity.  The

11   Williams case went on to hold that the Supreme Court permitted the initial disparity to be

12   rebutted by the record, but importantly, this rebuttal "must do more than indicate that the record

13   would support race-neutral reasons for the questioned challenges." Id. at 1108.

14           Here, the prosecutor utilized challenges to excuse three of four African-American

15   jurors.  This would be sufficient to initially create the statistical disparity necessary for the

16   inference accorded to a prima facie case.  The appellate court's determination that no prima facie

17   case existed despite this disparity was based in part on the record suggesting reasons why the

18   challenges were appropriate.  The undersigned has no choice, given Williams, to find that this

19   analysis is flawed, and therefore, not entitled to AEDPA deference.

20           However, the record as analyzed by the trial judge and appellate court does give

21   some reasons to doubt the existence of a prima facie case, and does not depend on the analysis of

22   the prosecutor.  First, an African-American juror actually sat on the jury.  More importantly, one

23   of the excused African-American jurors was *essentially conceded* then and now to be a proper

24   dismissal.  See RT 46, 500-502 (arguing only that the dismissals of Allen and James-Bowe were

25

26           [2] The Court of Appeal correctly recognized in its analysis that the prosecutor's
     explanations were not pertinent to the first step of the Batson analysis.  See Williams at 1106.

1  improper); Petition at pages 10-26 where only the excusal of two jurors is challenged as

2  discriminatory; Court of Appeal Opinion at *1 setting forth the concession.  When this fact is

3  taken into account, the  real statistical disparity falls to two out of four.

4          Nothing else in terms of "non-reason" matters, i.e., matters not involved in the

5  merits of the peremptory challenges, save two (discussed below), stands out in the record

6  rebutting or supporting the inference.  Factors such as the timing of challenges, with one

7  exception, or non-reason statements in the record, or other non-reason explanatory matters do not

8  rise to the level of rebutting the prima facie case.  On the face of the transcript answers, African-

9  American jurors Allen and James-Bowe were jurors who were not unfavorable to the

10 prosecution.

11         It appears from the transcript that peremptory challenges were made initially in

12 batches of two per side; then, additional jurors would be chosen and questioned.  The prosecutor

13 utilized eight of ten challenges.  African-American jurors to whom challenges were made were

14 strikes, 2, 3 and 8.  Mr. Allen was struck within the first two challenges.  Ms. Williams remained

15 on the potential jury.  She was then struck in the second round of peremptories after she

16 "volunteered" that she had no objection to the excusal of a juror.  RT (Augmented) 117.

17 However, the timing of this challenge is not suspicious – her conduct was rather bizarre and

18 warranted a quick challenge.

19         On the other hand, Ms. James-Bowe remained on the jury after one "batch of

20 peremptory" challenges and was not excused until the final volley of challenges.  The prosecutor

21 passed *three times* before striking Ms. James-Bowe.  See RT (Augmented) 138, 177, 200.  The

22 prosecutor's (and the trial court's) reasoning that Ms. James-Bowe was unpalatable to the

23 prosecution is hard to fathom given the number of passes, i.e., the number of times the prosecutor

24 stated that she would take the jury as constituted *including* Ms. James-Bowe.

25         While the statistical percentage of African-American exclusion are not as great as

26 in other cases, again, the discussion here focuses only on inferences.  Moreover, the passing by

8

1    the prosecutor of opportunities to challenge Ms. Jame-Bowe, i.e., the prosecutor's implicit

2    statement that Ms. James-Bowe was an adequate juror, and then the last minute striking of this

3    juror, raises an inference of discrimination.  Respondent recognizes this as well, as respondent

4    states that steps two and three of <u>Batson</u> are at issue here.  Therefore, the undersigned finds that

5    petitioner established a prima facie case, i.e., that sufficient inferences were raised, and that the

6    state courts' findings to the contrary are not properly supported, and were indeed, AEDPA

7    unreasonable as not focusing upon the proper Supreme Court endorsed analysis.[3]

8         As respondent correctly argues, the above does not stop the analysis.  In <u>Williams</u>,

9    the state trial court had found the lack of a prima facie case, and the trial judge did not ask the

10   prosecutor for an explanation of reasons.  <u>Williams</u> found that the appellate court's

11   reconstruction of the record to determine the existence of reasons to find the use of challenges

12   non-pretextual was based on its speculation of what the prosecutor's reasoning "might" have

13   been, and therefore improper in the analysis.  Here, the trial court did ask the prosecutor for her

14   reasoning and that reasoning is set forth in the record analysis of the Court of Appeal, albeit

15   attributed in part to the record and the trial court, and then to the prosecutor in an alternative

16   analysis.

17        In its introductory sections, the Court of Appeal accurately characterized the voir

18   dire of jurors Allen and James-Bowe[4]:

19        Mr. A. had previously worked for FedEx as a dangerous goods specialist and bulk
          courier but was unemployed. The judge informed Mr. A., "[I]f you're out looking
20        for a job and we will be impeding you, then tell me." Mr. A. responded, "No." Mr.
          A. had long-time friends working for law enforcement, one who worked for the

21

22        [3]  The trial judge never explained his reasoning as to the non-existence of a prima facie case,
     and neither did the appellate court.  That is, there appeared no explanation as to why the
23   striking of three African-American jurors did not even give rise to a plausible *inference* of
     discrimination.  And, as stated above, the Court of Appeal engaged in a determination of the
24   adequacy of the reasons to have struck the African-American jurors when determining the prima
     facie case, something that the Ninth Circuit has said is impermissible.
25
26        [4]  As previously found, no one could reasonably assert that the challenge to juror
     Williams was but a pretext for discrimination.

police department in Temple City and another working for the California Youth
Authority. Mr. A. stated that his friendships did not cause a bias in favor of law
enforcement. Mr. A. once witnessed the theft of a car stereo. Mr. A.'s relatives had
been victims of crimes. Ten years ago, the 22-or 23-year-old son of a close first
cousin was killed during a gang conflict over "turf" in Chicago. Mr. A. did not
know the son well because of the age difference and the geographic location. At
family reunions, the killing is remembered but not discussed. Recently, another
cousin was choked to death allegedly by her fiancé in Little Rock, Arkansas. A
second cousin had been charged with possession of controlled substances and
illegal possession of weapons. The cousin never complained and Mr. A. believed
the charges were fairly brought. Also, a long-time friend was convicted of driving
under the influence of alcohol or drugs in the late 1980's. Mr. A. claimed that
there was nothing about the cases that would influence him.

The prosecutor did not question Mr. A. and excused him, using her second
peremptory challenge.

Ms. J.-B.

Ms. J.-B. worked for a shipping company, DHL, in the customer service call
center. A family friend worked with the Department of Corrections as a nurse at
the hospital at the Vacaville prison. She knew no one who had had a negative
experience with law enforcement, had never been a victim of or witness to a
crime, had never been charged with a crime and knew no one who had. Her
husband's car was vandalized in 2001 and the person was never caught. She felt
comfortable judging credibility and had no moral or religious beliefs that would
affect her ability to be a juror. She volunteered that she had previously been an
assistant manager for many years. She had heard many excuses from employees.
Ms. J.-B. said she could follow the court's instructions. She did not believe there
was anything else that the court or parties needed to know about her in view of the
other questions and felt she could be fair to both sides.

Neither the prosecutor nor defense counsel had any questions for Ms. J.-B. The
prosecutor later excused Ms. J.-B. after passing on the jury three times.

People v. Wade at *2

The prosecutor gave her reasons for striking jurors Allen and James-Bowe as

reported by the Court of Appeal at *3:

Although stating expressly it was not finding a prima facie case, the court asked
for the prosecutor's reasons. With respect to Mr. A., the prosecutor stated that she
routinely did not keep a potential juror who was unemployed and in the case of
Mr. A., he expressed no desire to find a job. The prosecutor also cited Mr. A.'s
cousin's son who was the victim of a gang killing and had been in a gang as well.

With respect to Ms. J.-B., the prosecutor was concerned because the prospective
juror was "extremely quiet" and volunteered little information in answering the
court's questions. The prosecutor also stated that she "almost always kick[s] jurors

10

with a hyphenated last name" regardless of the person's race. She thought that persons with hyphenated names have a difficult time making decisions.

As recognized by the Court of Appeal, the prosecutor's explanations were race neutral.  However, by its very words, the Court of Appeal stopped there, never issuing a formal pronouncement on lack of pretext – a mandatory analysis.[5]  The undersigned does not recognize the lengthy explanation about race-neutrality of the comments as doing double duty for the pretext issue.  The one "moreover" comment about having an African-American on the jury, which does implicate lack of pretext, does not stand as a ruling that the previous paragraphs were all about pretext as well as race-neutral statements.

However, the trial judge's comments about the two stricken African-American jurors, after asking the prosecutor to give her reasons, could only be viewed as a discussion of pretext as an alternative to his ruling that no prima facie case had been satisfied.

> As to Mr. Allen, I would note that he had numerous family members that had been victims of crimes, as well as charged and arrested and convicted of crimes, and there was ample reason for him to be excluded just on his history without regard to race.
>
> ***
>
> As to Kristin James-Bowe, the juror was very quiet.  Seemed like a very nice person, But it was one of those jurors that was very hard to know.
> I would note that somewhat like the gentleman, white gentleman. I think, the defense excluded, juror number two at the very start of the day, maybe the People kicked him, very, very, quiet guy.  Just didn't respond, doesn't give you much, so it was kind of hard to know what's in their heart or their mind.  White male that was excluded.
>
> My point is by analogy there's people that you can't really get a sense of, unlike (Redacted-Juror Number Six), who was very open, you could see how she thought on her face and through her manner of speaking and talking.  You had a sense of who she was and how her mind worked, referring to the other African-American juror who's on that panel.

---

[5]After a lengthy discussion on the persuasiveness of the prosecutor's explanations, the Court of Appeal concluded: "Sufficient evidence supports the trial court's finding that the prosecutor offered a race-neutral reason for exercising her peremptory challenge to excuse Mr. A."  People v. Wade at *5.  "The record supports the trial court's determination that the prosecutor offered a race-neutral reason for excusing Ms. J.-B."  Id.  At the second point in the Batson analysis, the record is not reviewed at all; the only inquiry is whether the stated reason is *facially* non-discriminatory.

1  RT 50-51.

2        On the renewed <u>Wheeler/Batson</u> motion made in a motion for new trial, the judge

3  reiterated his reasoning about these two jurors, but also indicated that juror James-Bowe was

4  young, and hence inexperienced (not a reason given by the prosecutor).  RT 506.  He somewhat

5  inconsistently stated that she would be a "follower," but then stated that she might be one who

6  would be stuck in her opinions.  RT 506-507.

7        The point of the analysis at this juncture is not whether there were theoretically

8  possible justifiable reasons for striking the two jurors, but whether the prosecutor's explanations

9  were but a pretext for discrimination.  The undersigned will assume that the trial court's

10  agreement with the prosecutor on her reasons indicates that he did not find the reasons pretextual,

11  at least insofar as the trial judge commented on the prosecutor's reasons.

12        With respect to Mr. Allen, the trial judge did not engage in any analysis of the

13  good points (from a prosecutor's standpoint) of juror Allen: law enforcement contacts, but

14  merely focused on the fact that some of Allen's cousins, or sons of cousins, had been victims or

15  perpetrators of crime.  It is somewhat of a stretch to say that sons of cousins are close family

16  members (when Allen said he did not know the cousin's son well), or that having far flung

17  family members who are victims of crimes predisposes one to being a poor prosecution juror.

18  One might well intimate just the opposite, and several of the seated jurors had been victims of a

19  crime or had family members who had been victims.  Indeed, there were jurors kept on the jury

20  who had been direct victims of a crime.  Juror No. 12 was a bank teller who had been robbed [6],

21  RT (Augmented) 29, Juror No. 9, robbed at gunpoint, and involved as a victim in an extortion

22  plot, RT (Augmented 145), Juror No. 2, robbery victim, RT (augmented) 193, Juror No. 11, ex-

23  husband and she a victim of a serious assault, RT (Augmented) 191-192,  Juror No. 7, car stolen,

24  RT (Augmented) 186.

25  _____

26        [6]  We cannot determine who actually served on the jury because their names were redacted and they were referenced simply by a number.

1    While having family members involved in crime as alleged perpetrators could

2    poison the prosecution's well, i.e., the potential juror may have thought the system treated the

3    family member poorly, again – Mr. Allen stated that none of his cousin's problems would affect

4    him at all.  RT (Augmented) 44.  Therefore, quaere – was the prosecutor being candid when she

5    announced this reason.

6    The characterization that Mr. Allen did not care about being unemployed is more

7    than a bit stretched.  In a lengthy explanation/question, Allen was asked: The Court: "And you

8    indicate presently you're not employed.  Are we going to stop you from getting a job or are you

9    out looking right now?  If you are , I'll let you go.  I'm just asking.  I'm not – if you want to

10   volunteer your time, we would love to have you, but if you're out looking for a job *and we will*

11   *be impeding you*, then tell me.  A. No."  RT (Augmented) 21 (emphasis added).  The actual

12   question and answer only indicates that Allen would not be impeded in looking for a job if he

13   served on this jury.  Moreover, the entire venire of prospective jurors was informed at the very

14   start of jury selection that "it's going to be a very brief trial."  RT (Augmented )2.  In light of the

15   fact that this was going to be a very brief trial and the nature of the "impede" inquiry to juror

16   Allen, there are many reasons besides laziness which could account for the "no" answer – the

17   shortness of the trial would not impede any efforts to find work, he would be called back to work

18   in a few weeks, he was retired, he was looking for a job, but because of circumstances, he would

19   not be presently impeded in looking, he was recovering from an illness, he was assisting his

20   spouse, and so forth.  However, he was *never* questioned *why* he would not be presently impeded

21   from looking for work if he served on the jury.  The prosecutor simply assumed from this barren

22   record that this African-American man was lazy.  Again, the analysis here focuses on whether the

23   prosecutor's determination to ascribe laziness to Mr. Allen (which, if true, would be a legitimate

24   reason for exercising a peremptory) was borne out by the record.  It was not, and the prosecutor's

25   rush to judgment on the laziness issue says much about her state of mind.

26   \\\\\

1          The undersigned has difficulty with the challenge to this juror.  If the only reason

2   given was the criminal involvement of this juror's extended family, the trial judge's affirmation

3   of the challenge would be questionable but AEDPA reasonable.  However, in combining the two

4   reasons, i.e., the totality of the circumstances concerning this juror, there is simply too much

5   indicia of sub-conscious bias to find that the prosecutor's reasons were not pretextual.  The trial

6   judge's decision to the contrary was AEDPA unreasonable.

7          The same can also be said for Ms. James-Bowe.  As indicated above, nothing in

8   the voir dire demonstrated that this juror's background or experiences would be unfavorable to

9   the prosecution – even a little bit.  And, the prosecutor did not state that she was challenging

10   juror James-Bowe on this basis.  Rather the prosecutor claimed that Ms. James-Bowe was quiet,

11   and the trial judge agreed.  But the trial judge had asked the questions, which essentially called

12   for a yes or no answer, or otherwise a very short answer.  See RT 101-104, 106.  For example:

13   "The Court: [gives a lengthy instruction about what a juror should do if they later recognize a

14   witness] Do you think you can follow rules like that, ma'am?. A. Yes."  RT (Augmented)105-

15   106.  How else should a juror answer that question?  Further, "The Court...Let me start with Miss

16   Jamesbough.  Okay.  Tell me about the nature of your work. A. I work at DHL.  It's a newer

17   shipping company. I work at the customer service call center.  The Court: And this is a good

18   chance for you to give an ad for your company.  What color vehicle do they drive? A. They are

19   bright yellow with red letters."  RT (Augmented) 101.  The witness did not go on and on – she

20   simply answered the question, but did add a little.  If this juror were quiet, she would have

21   answered the first question about her work with a simple – I work at DHL.  The remainder of the

22   answer which she did give was volunteered information.  The fact that the prosecutor

23   inaccurately characterized the voir dire is a point to be taken about the inadequacy

24   (pretextualness) of her explanation.

25          Even if she were quiet, and the undersigned is in error just by looking at the black

26   and white of the transcript, there were many jurors chosen who were similarly quiet, i.e.,

1  answered the question without hemming, hawing, story telling or non-responsive information.

2  See Juror 4 (very short answers) RT (Augmented) 11-12; Juror 6 (fairly short answers, one

3  extrapolation) RT (augmented) 24; Juror 10 (very cryptic, unexplained answers) RT

4  (Augmented) 122-125; Juror No. 5 (cryptic answers) RT (Augmented 134-135); Juror 3 (short, to

5  the point answers) RT (Augmented)179.  Thus, if being "quiet" was not a virtue, there were

6  many jurors which should have been struck by the prosecution.[7]

7          The prosecutor also announced that she struck juror James-Bowe because of her

8  hyphenated name – that such meant that the juror could not make decisions.  The logic of this

9  explanation, of course, is a non-sequitur, and even bizarre.  The Court of Appeal was correct in

10 its view, insofar as it went, that such does not *per se* disqualify a reason from being facially non-

11 discriminatory, but the point here is whether the reason was pretextual.  It stands to reason that

12 the more bizarre or senseless the reason given, the more likely that it is pretextual.

13         The undersigned further, and again, relies on the fact that the prosecutor passed

14 three times when she could have struck this juror that was supposedly inscrutable and  "would

15 not be able to make decisions."  If these were really sore points with the prosecutor, why would

16 she risk having this juror remain as she was passing (and then exercising strikes against other

17 jurors when the peremptory challenge session continued).  The undersigned understands that

18 there can be tactical reasons for "passing" when one could still exercise peremptories, e.g., the

19 hope that the other side will be encouraged to pass also thereby leaving otherwise favorable

20 prosecution jurors on the panel, but the probabilities are that this tactic would not be used three

21 times if there were serious reason to strike the ultimately struck juror.

22 \\\\\

23

24         [7] The Court of Appeal reasoned that other jurors may have been similarly quiet, "but may
   have given clues about their demeanor which is not reflected on the record and was subject to
25 observation."  People v. Wade at *5.  However, it is just as easy to speculate the other way, and if
   all that was necessary in a Batson analysis was such speculation about the other similarly "quiet"
26 jurors, a challenge based on "quietness," would be unchallengeable in a Batson motion.

15

1   No discussion will be made about the relative youth of the juror, discussed by the

2   trial judge, because the prosecutor did not raise this as a reason to strike Ms. James-Bowe.

3   The undersigned has factored in the presence of an African-American on the jury

4   (Juror 6), a juror not struck by the prosecution even though the prosecutor has peremptory

5   challenges left.  This fact detracts from a finding of pretext.  Nevertheless, the above findings

6   involving Jurors Allen and James-Bowe greatly outweigh the inference to be drawn by the

7   presence of one African-American juror.

8   In sum, the undersigned is far from certain that the prosecutor had a conscious

9   bias when she dismissed potential Jurors Allen and James-Bowe, but the clear probability is,

10  judging from the totality of the circumstances, that there was a sub-conscious bias.  The decision

11  to the contrary was not reasonable.  The writ should be granted on this ground.[8]

12  B.  Lesser Included Offense Instruction

13  The undersigned places this issue in context by quoting the background given by

14  the Court of Appeal.

15  At 11:30 a.m. on November 10, 2003, defendant robbed the Washington Mutual
    Bank on Freeport Boulevard. Defendant walked up to the window of teller
16  Monique Bruner and handed her a note which stated, "Hand me your fifties and
    hundreds," maybe "twenties," and "don't get hurt." Bruner asked defendant
17  whether he meant it. Mumbling, defendant lifted his shirt and reached for his
    pants pocket. Bruner gave the money to defendant who left the bank. Bruner
18  pressed the alarm and informed her manager that she had been robbed. Bruner
    watched defendant run around the corner of the bank.
19
    A bank surveillance camera took photographs of the robbery and robber. No
20  usable prints were found on the teller's counter.

21  When interviewed by a detective, Bruner described the robber as a "[m]ale Black,
    early thirties, five-seven, two hundred ten pounds, heavy build" with "short black
22  hair," "unshaven with a mustache," dark complexion, wearing "dark sunglasses
    with black rims, Ray-Ban type," "light green and black long sleeve plaid shirt with
23  blue jeans." A month after the robbery, Bruner viewed a photo lineup and
    identified defendant's photograph as that of the robber.
24

25

26  [8] Even only one improper challenge will result in a successful Batson challenge.

16

> When defendant was arrested on November 12, 2003, he was wearing pants with red thread in the design of an Asian character on the back right pocket. One of the surveillance photos showed the robber with pants with red coloring on the back of one leg.

People v. Wade at *1

As the trial judge indicated, RT 334-335, petitioner's main defense was one of wrong identity. However, petitioner had requested instructions concerning lesser included offenses to robbery, i.e., grand theft. Petitioner claimed that the bank teller had not been sufficiently fearful in order for a robbery to have been committed – property taken from another against her will committed by force or fear. Cal. Penal Code § 211, RT 437.

Respondent notes that petitioner's claim herein was denied on account of untimeliness, and observes that the claim is procedurally barred. As did respondent, the undersigned will review the merits.[9]

Respondent cites the appropriate cases for the proposition that the failure to instruct on lesser included offenses in non-capital cases does not state a federal claim. James v. Reece, 546 F.2d 325, 327 (9th Cir. 1976), but subject to the rule swallowing exception that if the lesser offense could be construed as a theory of the defense, then a federal claim is stated. Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir. 1984); Solis v. Garcia, 219 F.3d 922, 928-29 (9th Cir. 2000). The basic rule espoused by James, therefore, does not have much practical effect since if the instruction does not fit a theory of the defense, no one should realistically care whether the instruction was given or not.

From a review of the transcript, the trial judge was correct that petitioner's defense was one of wrongful identity. However, this does not mean that the lesser included offense theory could not have been useful to petitioner in an alternative sense – one could make

---

[9] The Ninth Circuit has never upheld the Clark/Robbins procedural bar in a published decision, nor in an unpublished decision to the undersigned's knowledge, and is never likely to do so. There is no point in analyzing the bar herein.

the dual argument that he was not the robber, and a robbery did not take place under the facts. Nevertheless, regardless of whether petitioner may have been aided by the instruction in the abstract, it remains crystal clear that there is no duty to instruct on a lesser offense, or give any substantive instruction desired by a defendant unless there is evidence to support it.  Conde v. Henry, 198 F.3d 734, 739 (9th Cir. 1999).

This is where petitioner's argument fails.  He argued before the trial court, as he does here, that because the teller was more surprised and stunned that a robbery was taking place at all, at least initially, she did not have the requisite fear to make the bank robbery a robbery. Petitioner is wrong on the law and the facts.

Respondent has accurately summarized the testimony, and the undersigned will repeat it here:

> Miss Bruner, the bank teller at the time of the incident, testified at trial.  She testified that a person handed her a note , demanding "fifties and hundreds" and maybe "twenties."  (RT 66, 68.)  The note said, "don't get hurt."  (RT 66, 68.) Bruner asked the man if he was serious because the bank had metal detectors so she did not think that could happen.  (RT 68.)  Bruner was surprised, and she did not give the man the money right away because she was shocked.  (RT 68-69) Bruner gave the man the money when he started acting like he was reaching for a gun.  (RT 69.)  She felt threatened, fearful, and nervous.  (RT 69.)

Answer at 17.

Fear may be proven by the circumstances involved in the taking of property. People v. Holt , 15 Cal.4th 619, 690 (1997).  The fear need not be induced by an explicit threat, and it is sufficient if there is evidence to support an inference that the victim was in fact afraid. People v. Flynn, 77 Cal.App.4th 766, 771-772 (2000); People v. Mungia, 234 Cal.App.3d 1703, 1709, fn. 2. (1991).  "[T]he fear necessary for robbery is subjective in nature, requiring proof 'that the victim was in fact afraid, and that such fear allowed the crime to be accomplished.'" People v. Anderson  152 Cal.App.4th 919, 946 (2007); see People v. Cuevas , 89 Cal.App.4th 689, 698 (2001) [actual fear by victim required, but it "may be inferred from the circumstances, and need not be testified to explicitly by the victim"].

1    In fact, Ms. Bruner testified that she felt fearful, and indeed, the circumstances

2 indicated that she was afraid.  Petitioner has produced no evidence to the contrary.  Simply

3 because the teller was at first surprised, and did not immediately recognize the situation as a

4 robbery, is of no consequence.  In short, there was no justification for requesting the lesser

5 included offense instruction of grand theft.

6    Petitioner's claim for ineffective assistance of appellate counsel for failure to

7 instruct on lesser included offenses should be denied, and to the extent the claim is brought as a

8 trial error claim, the claim should be similarly denied.

9    C.   The Cunningham Claims

10    In the trial that preceded petitioner's retrial on the one bank robbery charge,

11 petitioner was sentenced to the three year upper term on the grand theft charge (Count 3),

12 doubled on account of a prior strike for six years.  After the retrial on Count 2 resulting in

13 petitioner's robbery conviction, the trial judge sentenced as follows: Sentenced to the high term

14 on Count 2 doubled on account of a prior strike for a base term of ten years.  Petitioner was

15 resentenced on Count 3 to the mid-term, doubled for the prior strike, but this sentence was

16 imposed concurrently to Count 2, effectively making the sentence largely irrelevant.  Under

17 California law, the prior conviction also resulted in an enhancement of five years for Count 2 for

18 a grand total of 15 operative years.

19    The trial judge imposed the upper term on Count 2 on account of petitioner's

20 numerous prior convictions, RT 540, and the increasing seriousness of his criminal activity, RT

21 539.

22    Petitioner contends that he was entitled to a jury trial on the factors which caused

23 the judge to impose the upper term on Count 2.  Petitioner also believes that he was

24 consecutively sentenced and was entitled to a jury trial on the reasons for consecutive sentencing;

25 however, petitioner is mistaking the "two strike doubling enhancement" on Count 2 and Count 3

26 for consecutive sentencing.

1    In Apprendi v. New Jersey, 530 U.S. 466 (2000), the United States Supreme

2    Court held as a matter of constitutional law that, other than the fact of a prior conviction, "any

3    fact that increases the penalty for a crime beyond the prescribed statutory maximum must be

4    submitted to a jury, and proved beyond a reasonable doubt."  530 U.S. at 490.  In Blakely v.

5    Washington, 542 U.S. 296 (2004), the Supreme Court held that the "statutory maximum for

6    Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts

7    reflected in the jury verdict or admitted by the defendant."  Blakely, 542 U.S. at 303.  There is a

8    narrow exception to this rule, however, for enhancements that are based on prior convictions;

9    these need not be submitted to the jury.  See Almendarez-Torres v. United States, 523 U.S. 224,

10   244 (1998) ("[T]o hold that the Constitution requires that recidivism be deemed an 'element' of

11   petitioner's offense would mark an abrupt departure from a longstanding tradition of treating

12   recidivism as 'go[ing] to punishment only.'"); Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008).

13   In People v. Black, 35 Cal. 4th 1238 (2005) ("Black I"), the California Supreme

14   Court held that California's statutory scheme providing for the imposition of an upper term

15   sentence did not violate the constitutional principles set forth in Apprendi and Blakely.  The

16   court in Black I reasoned that the discretion afforded to a sentencing judge in choosing a lower,

17   middle or upper term rendered the upper term under California law the "statutory maximum."

18   Black I, 35 Cal. 4th at 1257-61.

19   In Cunningham v. California, 549 U.S. 270 (2007), the United States Supreme

20   Court held that a California judge's imposition of an upper term sentence based on facts found by

21   the judge (other than the fact of a prior conviction) violated the constitutional principles set forth

22   in Apprendi and Blakely.  Cunningham expressly disapproved the holding and the reasoning of

23   Black I, finding that the middle term in California's determinate sentencing law was the relevant

24   \\\\\

25   \\\\\

26   \\\\\

1    statutory maximum for purposes of applying <u>Blakely</u> and <u>Apprendi</u>.  <u>Cunningham</u>, 549 U.S. at

2    291-94.[10][11]

3       In light of <u>Cunningham</u>, the Supreme Court vacated <u>Black I</u> and remanded the

4    case to the California Supreme Court for further consideration.  <u>Black v. California</u>, 549 U.S.

5    1190 (2007).  On remand, the California Supreme Court held that "so long as a defendant is

6    eligible for the upper term by virtue of facts that have been established consistently with Sixth

7    Amendment principles, the federal Constitution permits the trial court to rely upon any number

8    of aggravating circumstances in exercising its discretion to select the appropriate term by

9    balancing aggravating and mitigating circumstances, regardless of whether the facts underlying

10   those circumstances have been found to be true by a jury."  <u>People v. Black</u>, 41 Cal. 4th 799, 813

11   (2007) (<u>Black II</u>).  In other words, as long as one aggravating circumstance has been established

12   in a constitutional manner, a defendant's upper term sentence withstands Sixth Amendment

13   challenge.

14      Thereafter, relying on <u>Black II</u>, the Ninth Circuit confirmed that, under California

15   law, only one aggravating factor is necessary to authorize an upper term sentence.  <u>Butler v.</u>

16   <u>Curry</u>, 528 F.3d 624, 641-43 (9th Cir. 2008).

17      Cal. Rules of Court 4.421(b)(2)  provides that numerous convictions may justify

18   an upper term: "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile

19   delinquency proceedings are numerous or of increasing seriousness."  Petitioner's assertion that

20   the word "numerous" takes the imposition of the upper term in his case outside the <u>Apprendi</u> et

21   al. exception is frivolous.  The fact that the prior convictions have to be counted does not turn the

22   prior conviction exception into a jury question.  Similarly, the fact that the present conviction

23   _____

24    [10] The Ninth Circuit subsequently held that <u>Cunningham</u> may be applied retroactively on
     collateral review.  <u>Butler v. Curry</u>, 528 F.3d 624, 639 (9th Cir. 2008).

25    [11] The effect of <u>Cunningham</u> is much dissipated in that the California legislature,
26   subsequent to <u>Cunningham</u>, provided that the upper term was the statutory maximum.  <u>See</u>
     <u>People v. Sandoval</u>, 41 Cal. 4th 825, 845, 62 Cal. Rptr. 3rd 588, 603 (2007).

1  would be viewed as more serious than prior convictions is not a matter which is outside the prior

2  conviction exception.

3          Petitioner also contests the application of consecutive sentence without jury

4  findings on the factors which warrant consecutive sentencing.  First, as indicated above,

5  petitioner did not receive consecutive sentences.  Even if he did, in Oregon v. Ice, --- U.S. ----,

6  129 S.Ct. 711, 714-15 (2009), the Supreme Court held that trial judges are authorized to make

7  the findings of fact supporting decisions to impose consecutive sentences.

8  *Conclusion*

9          IT IS HEREBY RECOMMENDED that the writ of habeas corpus should be

10 granted as to the Batson claim, and petitioner should be ordered retried or released.  The petition

11 should be denied on all remaining grounds.

12         These findings and recommendations are submitted to the United States District

13 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

14 days after being served with these findings and recommendations, any party may file written

15 objections with the court and serve a copy on all parties.  Such a document should be captioned

16 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

17 shall be served and filed within fourteen days after service of the objections.  The parties are

18 advised that failure to file objections within the specified time may waive the right to appeal the

19 District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

20 DATED: 06/22/2010

                                             /s/ Gregory G. Hollows

21                                           _____

22                                           UNITED STATES MAGISTRATE JUDGE

GGH:gh:035
23 wade0456.157

24

25

26